**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-00789-SRB |
| | ) | |
| RICHARD F. MOSELEY, SR., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**KENDAL BLEVINS' SUGGESTIONS IN OPPOSITION TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

A. BLEVINS' RESPONSES TO THE SJ/RECEIVER'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS ..... 1

B. BLEVINS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS ..... 16

1. The Stay imposed by the court on October 3, 2014 tolled the MUFTA Statute of Limitations ..... 17

2. WWW did not receive a reasonably equivalent value for the $276,400 as a matter of law. ..... 18

3. The Transfers from WWW to SJ are Voidable By Blevins as Fraudulent Tranfers ..... 21

4. Blevins' Claims as Set Forth in the Previous Paragraph are not Limited by R.S. MO. § 428.029 ..... 23

C. CONCLUSION ..... 24

# TABLE OF AUTHORITIES

Cases


American Communications v. Commerce North Bank, 691 S.W.2d 44, 48 (Tex.App. 1985) .......... 10

*Crumpton v. Vick's Mobile Homes, LLC* .......... 7

*El Deeb v. Univ. of Minnesota*, 60 F.3d 423, 428-29 (8th Cir. 1995) .......... 9

Gonsalves v. Li, 232 Cal.App.4th at pp. 1416–1417 (Cal. App. 2015) .......... 10

*Higgins v. Ferrari*, 474 S.W. 3d 630, 640 (Mo. App. W.D. 2015) .......... 19

*Higgins v. Ferrari*, 474 SW 3d 630, 636 (Mo. Ct. App. 2015) .......... 22

*In re Congrove*, 222 Fed. Appx. 450, 454 (6th Cir. 2007) .......... 20

*In re Gerdes*, 246 B.R. 311, 313 (Bankr. S.D.Ohio 2000) .......... 20

*In re James River Coal Co*., 360 B.R. 139, 166 (Bankr. E.D. Va. 2007) .......... 19

*In re Jeffrey Bigelow Design Grp., Inc*., 956 F.2d 479, 484 (4th Cir. 1992) .......... 20

*In re Johnson Bros. Truckers Inc*., 9 Fed.Appx. 156, 165 (4th Cir. 2001) .......... 20

*In re Pearson*, No. 1:10-bk-00946MDF, 2010 WL 3956762, at *3 (Bankr. M.D. Pa. 2010) .......... 22

*In re Werner* 386 B.R. 684, 693 (Bankr. N.D. Il. 2008) .......... 17

*J&J Sports Prods., Inc*. v. Saenz, note 32 (S.D. Tex. 2016) .......... 10

*Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir.1949) .......... 9

*O'Donnell v. Royal Bus. Group, Inc*. 180 B.R. 1, 11 (Bankr D. Me 1995)................................. 19

*Sender v. Dillow* Case No. 13-2170-RDR, pp. 8-10 (D. Kan. 2013).......................................... 17

Winn Dixie Stores, Inc. v. Gerringer 563 So.2d 814, 817 (Fla. Dist. Ct. App. 1990)................ 10

Statutes

KS Code § 17-7689(a)(6)........................................................................................................ 7

KS Code § 17-7689(b) ............................................................................................................ 7

R.S. Mo. § 428.005 .................................................................................................................. 15

R.S. Mo. § 428.024.1(1) .......................................................................................................... 18

R.S. Mo. § 428.049(1) ............................................................................................................. 18

Rules

Fed. R. Civ. P. 56(e) ................................................................................................................. 8

Treatises

10A CHARLES A. WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed.1983) ............................................................ 9

37 Am.Jur.2d Fraudulent Conveyances and Transfers § 7 ......................................................... 20

8A C.J.S. Bankruptcy § 692........................................................................................................ 20

COMES NOW, Kendal Blevins ("Blevins" or "Movant"), the Movant herein, by and through her counsel, Kenneth N. Caldwell, of Caldwell Law Firm, P.C., and submits the following Suggestions in Opposition to SJ Partners/Receiver's Motion for Summary Judgment on Kendal Blevins' Uniform Fraudulent Transfer Act ("UFTA") claims.

Many of the Exhibits referred to herein are the Receiver's Exhibits identified as R_. Blevins's Exhibits are identified as KB-1 and KB-2.

Based on the undisputed facts contained herein, summary judgment should be entered in favor of Blevins on her UFTA claims.

## A. BLEVINS' RESPONSES TO THE SJ/RECEIVER'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. On or about April 25, 2014, Kendal Blevins ("Blevins") entered into a Contract for Legal Services with the law firm of Ensz & Jester, P.C. "to prosecute [Blevins'] claim for compensation and/or damages against Worldwide Wireless, LLC and all other persons or entities considered liable as a result of an occurrence . . . ." *See* Contract for Legal Services (Exhibit R1), KB-E&J-00001194.

Uncontroverted.

*2.* The Contract for Legal Services described the "occurrence" as "inappropriate conduct directed toward Kendal Blevins by Scott Fodor and Worldwide Wireless employees as part of Blevins' employment with Worldwide Wireless." *Id.*

Uncontroverted.

3. On or about May 5, 2014, Blevins filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging harassment by Scott Fodor, who she stated was a regional manager for Worldwide Wireless, LLC ("WWW") and her supervisor. *See* EEOC Charge of Discrimination (Exhibit R2), KB-E&J-000022-23.

Uncontroverted, the charge of discrimination related to conduct that began to occur in December, 2013 and continued to occur until she was terminated in April, 2014. *See* EEOC Charge of Discrimination (Exhibit R2), KB-E&J-000022-23.

4. On September 9, 2014, the Court entered its Temporary Restraining Order with Asset Freeze (Doc. 8) preliminarily appointing Thomas McNamara as Receiver in this case.

Uncontroverted, however, it should be noted that the Complaint filed on 9/8/2014 against SJ partners and others alleged that the illegal conduct engaged in by SJ, began in 2011 or before. [Doc. 3, ¶ 31].

5. On October 3, 2014, the Court entered its Stipulated Preliminary Injunction with Asset Freeze, Appointment of Receiver, Expedited Discovery and Other Equitable Relief (the "Injunction") (Doc. 40), which confirmed McNamara's appointment as Receiver.

Uncontroverted. It should be noted that the Order also **stayed any action against SJ** or the other receivership entities. [Doc. 40, XXIV]. The Stay had to be lifted to allow Blevins to move forward with Blevins' garnishment and UFTA claims.

6. SJ Partners, LLC ("SJ") is a defendant covered by the Injunction. *See* Injunction (Doc. 40, page 4).

Uncontroverted.

7. Beginning on or about December 29, 2011, SJ had purchased and held a minority ownership interest in Worldwide Wireless, LLC. *See* relevant pages of 2011 Partnership Tax Return filed by SJ (Exhibit R7), Federal Statements, Statement 3, REC 195, REC 0203; Missouri Bank account statements (Exhibit R8), REC 0001, REC 0023 - 25 *and* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory Nos. 1 and 2, pgs. 4-5.

Uncontroverted.

8. The following funds were transferred between SJ and WWW between SJ's initial investment on December 29, 2011 and the final transfer from WWW to SJ on October 27, 2014:

| Date | Event | Transfer from SJ to WWW | Transfer from WWW to SJ |
|---|---|---|---|
| 12/29/2011 | Check from SJ to WWW | $440,000.00 | |
| 1/13/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 2/16/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 3/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 4/17/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 5/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 6/19/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 6/28/2012 | Check to Raizada Group, LP to increase investment to 14.55% | $200,000.00 | |
| 7/12/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 8/14/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 9/14/2012 | Deposit from WWW to SJ | | $5,820.00 |

| | | | |
|---|---|---|---|
| 10/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 11/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 12/17/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 1/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 2/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 3/14/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 4/12/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 5/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 6/24/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 7/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 8/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 9/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 10/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 11/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 12/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 1/22/2014 | Deposit from WWW to SJ | | $5,820.00 |
| 4/11/2014 | Deposit from WWW to SJ | | $5,820.00 |

*See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* Missouri Bank account statements and email (Exhibit R8), REC 0001 – 0081, 0659 – 0660.

Controverted. The factual statement is not supported by the Receiver's evidence. The 12/29/2011 table entry in the amount of $440,000.00 indicates that the check was made payable to WWW. However, the table entry does not indicate that the check made payable to WWW was actually endorsed over to The Raizada Group and was not deposited into WWW's bank account. [R8, Doc. 281-1, p.33 of 152, Check No. 102 and Endorsement on back of check,].

The 6/28/2012 table entry in the amount of $200,000.00 indicates the check was made payable to The Raizada Group. However, the table entry is shown as a "Transfer from SJ to WWW" which is not correct. Consistent with the entry in the table above, SJ Check No. 2007 was actually a check in the amount of $200,000.00 made payable directly to The Raizada Group and not to WWW. [R8, Doc. 281-1, p.34 of 152].

Both check Nos. 1002 and 1007 (Exhibit R8) show that no funds were actually transferred to WWW but rather the recipient of all these funds was in fact The Raizada Group.

9. SJ invested a total of $640,000 in WWW. *See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* relevant pages of Missouri Bank account statements (Exhibit R8), REC 0001, REC 0023 – 25, REC 0034 – 36.

Controverted in part. SJ may have purchased a Membership Interest in WWW from The Raizada Group for $640,000, however, Exhibit R8, Check Nos. 1002 and 1007 show that no funds were transferred directly to WWW by SJ and thus WWW's cash position was not increased by the transfers to The Raizada Group. On the other hand, WWW's net cash position was decreased by distributions to SJ.

10. In exchange for its capital contributions, SJ received a total membership interest of 14.55% in WWW as of 2014. *See* Receiver/Garnishee's Answers

to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 2, pg. 5 *and* 2014 Schedule K-1 issued by WWW to SJ (Exhibit R10), REC_70463-70469.

Controverted in part. There is no admissible evidence of capital or cash contributions to WWW whatsoever but rather the evidence shows transfers to third party, The Raizada Group. The Receiver's Exhibit R8, Check Nos. 1002 and 1007, show that there were no funds paid to, and no capital contributions, to WWW. [ Exhibit R8, Check Nos. 1002 and 1007].

11. SJ only received a total of $274,260 in funds transferred from WWW as return on its investment. *See* Receiver/Garnishee's Amended Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* Missouri Bank account statements and email (Exhibit R8), REC 0001 – 2, 0023 – 81, 0659 – 0660. Two of those distributions or transfers of funds from WWW were received shortly after the Receiver's appointment: (1) $5,820 on or about September 24, 2014, and (2) $116,400 on or about October 27, 2014. *See* Missouri Bank email (Exhibit R8), REC 0659 – 0660.

Controverted. There are two parts to the purported fact statement. First, the purported fact statement that SJ only received $274,260 from WWW. In response to a Request for Admission No. 6 [Doc. 281-1, p.119 of 152] the Receiver provided the following response.

16. Admit that the K-1 to SJ Partners, LLC. from WWW for 2015 showed a distribution to SJ Partners, LLC. in the amount of $520,475.

**RESPONSE:** The Receiver did not prepare the referenced 2015 Schedule K-1 from WWW to SJ Partners, LLC. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny the basis or reasoning for, information underlying, or the truth or accuracy of any amounts or entries included on the 2015 Schedule K-1. The Receiver admits the 2015 Schedule K-1 issued by WWW for SJ Partners, LLC, the document identified as REC_70470 – 70475 produced concurrently with his responses to these Requests, speaks for itself.

[Doc. 281-1, p.119 of 152]

The Receiver did not conclusively state that SJ did not receive the reported distribution in the amount of $520,475. Given that the Receiver has no personal knowledge that the additional amount of $520,475 was not paid to SJ or paid to another bank account of SJ, or another party on behalf of SJ, there is a disputed issue of fact with respect to that additional amount reported on SJ's K-1.

When the Receiver was appointed as Receiver for SJ on October 3, 2014, KS Code § 17-7689(a)(6) would have triggered SJ's cessation of Membership in WWW one hundred twenty (120) days after the Receiver was appointed. See KS Code § 17-7689(b). This would have occurred on approximately January 9, 2015, 120 days after the Receiver's appointment per KS statute. This cessation of SJ's membership interest would have triggered a transfer of whatever interest SJ had in WWW to the other then existing LLC members including The Raizada Group. See generally *Crumpton v. Vick's Mobile Homes, LLC*, 335 Ga. App. 155, 779 S.E.2d 136 (Ga. App. 2015). The fact that SJ did not have a legal interest in

WWW subsequent to January, 2015 may explain why SJ did not receive the $520,475 reported on the K-1 provided to SJ. Any distribution from WWW after SJ's Membership Interest in WWW ceased would likely have gone to The Raizada Group.

The second part of the purported fact statement is that $274,260 was received "as a return on investment." The Receiver did not even have any knowledge about the WWW investment appearing on SJ's Balance Sheet. See Receiver's response to Request for Admission No. 7 below.

7. Admit that the WWW asset appears on the **Exhibit A** Balance Sheet as a "current asset" valued at $558,808.00.

**RESPONSE:** The Receiver objects to the extent "the WWW asset" is vague, ambiguous, and subject to multiple interpretations. The Receiver admits Exhibit A speaks for itself. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny any basis for, or the actual valuation of or entry of the amount entered for, the "WWW asset" as of March 31, 2014.

[The Receiver's Responses to Blevins' First Request for Admissions, No. 7, Doc. 281-1, p.116 of 152.] The Receiver had no knowledge about the Investment in WWW and has no admissible evidence about whether theamounts received constituted a return on the investment.

Fed. R. Civ. P. 56(e) requires that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that

the affiant is competent to testify to the matters staged therein." Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge. *El Deeb v. Univ. of Minnesota*, 60 F.3d 423, 428-29 (8th Cir. 1995). Affidavits filed by a party in support of or in opposition to a motion for summary judgment must present evidence. *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir.1949); 10A CHARLES A. WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed.1983).

The Receiver has simply failed to comply with Fed. R. Civ. P. 56(e) in support of his factual statements including this one where he claims the amount stated constitutes a return on an unverified investment by SJ.

12. The Receiver has not received any other transfers, assets, or other items of any value from WWW since the final transfer from WWW on or about October 27, 2014. *See* Receiver/Garnishee's Amended Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-6, Missouri Bank account statements (Exhibit R8), REC 0001 – 2, 0023 - 81, 0659 - 0660, *and* Receiver's Answers and Objections to Garnishor's First Requests for Admission (Exhibit R11), Responses Nos. 19-21, 23, and 31.

Controverted. The Receiver's Response to Blevins' First Request for Admissions, Nos. 6 and 7 was as follows:

6. Admit that the K-1 to SJ Partners, LLC. from WWW for 2015 showed a distribution to SJ Partners, LLC. in the amount of $520,475.

> **RESPONSE:** The Receiver did not prepare the referenced 2015 Schedule K-1 from WWW to SJ Partners, LLC. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny the basis or reasoning for, information underlying, or the truth or accuracy of any amounts or entries included on the 2015 Schedule K-1. The Receiver admits the 2015 Schedule K-1 issued by WWW for SJ Partners, LLC, the document identified as REC_70470 – 70475 produced concurrently with his responses to these Requests, speaks for itself.

Based on the Receiver's responses above, WWW gave SJ a K-1 for a share of distributions in the amount of $520,475 for tax year 2015. The Receiver, in admitting No. 6 above, stated that he was unable to determine the "truth or accuracy" of the information contained in the K-1. This means that the Receiver doesn't know one way or the other whether SJ received the $520,475 distribution from WWW in 2015.

None of the sources cited in support of his purported fact statement are admissible. The Receiver's Answers and Objections to Garnishor's First Requests for Admission (Exhibit R11), Responses Nos. 19-21, 23, and 31 are the Receiver's own Responses to Blevins' Request for Admissions and are hearsay and not admissible. *J&J Sports Prods., Inc*. v. Saenz, note 32 (S.D. Tex. 2016). Alternatively, the Responses include at least partial denials and denials are inadmissible at trial (and on summary judgment.) *Winn Dixie Stores, Inc. v. Gerringer* 563 So.2d 814, 817 (Fla. Dist. Ct. App. 1990); *American Communications v. Commerce North Bank,* 691 S.W.2d 44, 48 (Tex.App. 1985); *Gonsalves v. Li,* 232 Cal.App.4th at pp. 1416–1417 (Cal. App. 2015).

13. Blevins filed her Petition in Johnson County District Court on February 12, 2015 alleging employment discrimination against Worldwide Wireless, LLC and Scott Fodor (the "Johnson County Case"). *See* Petition (Exhibit R12) *and* Docket Sheet, Johnson County Case (Exhibit R13). Her Petition was never amended. *Id.*

Uncontroverted.

14. SJ Partners, LLC was not a defendant in the Johnson County Case and was not mentioned in Blevins' Petition. *See* Docket Sheet, Johnson County Case (Exhibit R13), Petition (Exhibit R12), *and* Default Judgment Entry (Doc. 223-1).

Uncontroverted. Blevins had no knowledge of what had happened with WWW and no suspicion that WWW had transferred assets to SJ.

15. Blevins served WWW a copy of the Summons and Petition in the Johnson County Case through the Kansas Secretary of State. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Default Judgment Entry (Doc. 223-1).

In whatever manner it was served, the Kansas Court determined it was proper.

16. On August 6, 2015, Blevins' employment counsel, James Ensz of Ensz & Jester, sent her an email advising her that they would have difficulty in collecting any judgment against WWW and Fodor. *See* 8-6-15 email from Ensz to Blevins (Exhibit R3), KB-E&J-0000921. Blevins' counsel believed WWW was "out of business," and had "no reason to believe [Fodor had] assets of any significance justifying the expense necessary" to serve him, prosecute the case, and collect on any judgment against him. *Id.*

Uncontroverted.

17. Ensz & Jester recommended to Blevins that she obtain a default judgment against WWW and notify an allegedly affiliated or related entity named Spectrum Business Ventures, **"which seems to have more than a passing interest in protecting Worldwide's assets."** ***See*** **Exhibit** R3.

Controverted in part. Ernz & Jester actually obtained the default judgment for her and took whatever action they deemed appropriate at the time.

18. Blevins' counsel further advised her "[t]here very well could have been a fraudulent transfer of assets from Worldwide to Spectrum and/or its wealthy owner Amit Raizada [sic] that the latter will want to protect from a potential fraudulent conveyance action following a potential judgment against Worldwide in this case." *See* Exhibit R3.

> Uncontroverted that the quote appeared in a letter to her, however, suggesting that Amit Raizada "will want to protect himself from a fraudulent conveyance" claim had little if any meaning to Blevins and nothing whatsoever was mentioned about SJ being a possible transferee. Blevins had no possible way to know that money had been transferred from WWW to SJ based on such correspondence.
>
> Even WWW's Limited Liability Company Annual Report filed with the Kansas Secretary of State by Amit Raizada on February 23, 2015 under penalty of perjury. [attached hereto as KB-1] stated that he, individually, was the only Member of WWW who had an interest greater than 5%. There is no way that Blevins or her attorneys would have known otherwise.

19. On or about April 1, 2016, Blevins' employment counsel sent her a letter and memorandum summarizing some efforts undertaken by the firm to locate Amit Raizada. *See* 4-1- 16 letter and memorandum from Ensz to Blevins (Exhibit R4), KB-E&J-00009-11.

Uncontroverted.

20. On or about the same day, Blevins' employment counsel sent a letter to WWW, care of Angela M. Correll, Controller for Spectrum Business Ventures, Inc. *See* 4-1-16 letter from Ensz to Correll (Exhibit R5), KB-E&J-000014. The letter referenced Blevins' lawsuit against WWW and enclosed copies of the Petition, Blevins' Motion for Default Judgment, and Notice of Hearing. *Id.*

Uncontroverted.

21. On April 27, 2016, Blevins obtained an uncontested default judgment against Worldwide Wireless, LLC and Scott Fodor for alleged employment discrimination (the "Default Judgment"). *See* Default Judgment Entry (Doc. 223-1). The Default Judgment included actual damages in the amount of $150,000, punitive damages in the amount of $150,000 and attorneys' fees in the amount of $120,000. (Doc. 223-1). No judgment was sought or entered against SJ Partners, LLC in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Default Judgment (Doc. 223-1).

Uncontroverted. Blevins was unaware that SJ was a Member of WWW, Blevins' attorney was unaware that SJ may have once been a Member of WWW, and the Receiver did not undertake any investigation to try and determine why SJ was receiving significant payments from WWW or whether it was entitled to keep them.

22. On or about May 3, 2016, Ensz & Jester sent a letter to Blevins enclosing a copy of the Default Judgment. *See* 5-3-16 letter from Ensz to Blevins (Exhibit R6), KB-E&J-00001

– 5. The letter informed her that Ensz & Jester's "ongoing, active participation in this matter" was ending with the delivery of the Default Judgment. *Id.*

Uncontroverted.

23. Despite obtaining the Default Judgment, Blevins took no action to utilize any post- judgment discovery methods or processes through Johnson County District Court, or any other court, until she filed a Motion for Order for Hearing in Aid of Execution on May 14, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 3 (Exhibit R14).

Uncontroverted, but Blevins was precluded from taking action against SJ because of the stay entered October 3, 2014.

24. Despite obtaining the Default Judgment, Blevins took no action through, or otherwise attempted to utilize, any court process to attempt to execute, levy, or otherwise collect on the Default Judgment until she filed a Motion for Order for Hearing in Aid of Execution on May 14, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 4 (Exhibit R14).

Uncontroverted but the October 3, 2014 Receivership stay prevented her from taking any action against SJ.

25. Blevins made no mention of any potentially or allegedly fraudulent transfers related to the Default Judgment in any pleading or other document filed with any court until she filed her Redacted Motion for Garnishment and Suggestions in Support Thereof on December 31, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13);

Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 5 (Exhibit R14); *and* Redacted Motion for Garnishment and Suggestions in Support Thereof (Exhibit R15).

Uncontroverted, however, some unknown person hired an attorney for WWW and made it very difficult for Blevins' attorneys to obtain any documentation from WWW. Eventually, Blevins had to agree to a protective order to even look at any documents. When documents were obtained, it was first discovered in October, 2018 that a company by the name of SJ Partners, LLC. had at one time been involved with WWW. See Declaration of Edward Foster attached hereto as KB-2.

26. Blevins filed her Motion for Clarification of Stay Order Included in the Stipulated Asset Freeze Between the Parties and/or to Lift the Stay for Purpose of Allowing Garnishment of the Court Appointed Receiver Over the Assets of SJ Partners, LLC in this case on March 28, 2019. *See* Motion for Clarification of Stay Order (Doc. 223).

Controverted in part. When Blevins first contacted the Receiver for SJ about serving a Garnishment, the Receiver hired counsel to rebuff any attempt, claiming that any such attempt would violate a stay that protected the Receiver from such claims. Blevins drafted and file a motion to lift any applicable stay. The stay had been in place since October 3, 2014.

27. Blevins filed her Exceptions and Claims in this case, which was the first pleading stating her claim for relief or cause of action under the Missouri Uniform Fraudulent Transfer Act ("MUFTA"), R.S. Mo. § 428.005, *et seq.*, in this case on November 14, 2019. *See* Garnishor's Exceptions and Claims (Doc. 259).

Uncontroverted, however, Counsel for Blevins contacted the Receiver by email on

March 11, 2019 about the garnishment proceeding. The Receiver provided the following curt response on March 26, 2019.

To: Kenneth N. Caldwell

Read the order and proceed at your own peril.

Thomas W. McNamara
McNamara Smith LLP
655 W Broadway, Suite 1600
San Diego, CA 92101
619-269-0499
tmcnamara@mcnamarallp.com

The first pleading that indicated Blevins was pursuing the Raizada Group as garnishee was after Blevins domesticated her foreign judgment in Missouri in March, 2019.

## B. BLEVINS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

28. Amit Raizada filed a Company Annual Report for WWW with the State of Kansas on February 23, 2015. He stated under penalty of perjury that he was the only Member who owned 5% or more of the capital of WWW. See KB-1.

29. It would have been apparent to anyone searching the Public Records about WWW that Amit Raizada was 95% or greater owner of the capital of WWW. The name SJ Partners, LLC. was concealed from the Public. See KB-1.

30. Blevins' attorneys first discovered that there might be other viable Defendants in a garnishment or UFTA action after forcing WWW to release documents in October, 2019. See Declaration of Edward Foster attached hereto as KB-2.

## C. ARGUMENT AND AUTHORITIES

### 1. The Stay imposed by the court on October 3, 2014 tolled the MUFTA Statute of Limitations

The Receiver refused to allow Blevins to serve a writ of garnishment upon him until July 22, 2019 because of the stay that was imposed by the court on October 3, 2014. [See Stmt of Uncontroverted Fact No. 5] The stay was still in existence in 2019 and is still in existence today except with respect to Blevins' claims. But for the doctrine of equitable tolling, Blevins arguably would have never been able to assert her claim against SJ because an action against SJ was stayed when she obtained her Judgment, and the Receiver and the court kept the stay in place continuously until this garnishment proceeding.

The Receiver's Arguments, however, do not take into consideration equitable tolling principles that apply in a case like this. The UFTA Statute of Limitations was equitably tolled by the receivership stay from September 9, 2014 until it was lifted to allow her to assert her garnishment action against SJ. *In re Werner* 386 B.R. 684, 693 (Bankr. N.D. Il. 2008); *Sender v. Dillow* Case No. 13-2170-RDR, pp. 8-10 (D. Kan. 2013). When equitable tolling from September 9, 2014 until 2019 is factored into Blevins'

UFTA claims, it is clear that Blevins claims were filed well within the statute of limitations and are timely. The Receiver simply cannot prevail on his Statute of Limitations argument.

Even if equitable tolling didn't apply, Blevins UFTA claim under R.S. Mo. § 428.024.1(1) was not extinguished by R.S. Mo. § 428.049(1) because it would have allowed her a year after the transfer or obligation was or could reasonably have been discovered. Even WWW was concealing the fact that SJ was a member of WWW. See KB-1. Blevins did not discover that there might have been fraudulent transfers to a viable Defendant until October, 2018. [See Stmt of Uncontroverted Fact Nos. 28, 29, and 30]. She moved to lift the stay in March, 2019 well within the one year window allowed by the statute.

**2. WWW did not receive a reasonably equivalent value for the $276,400 as a matter of law.**

The SJ's backup argument to the Statute of Limitations is that WWW received reasonably equivalent value from SJ for the transfers to WWW ending in 2014. There is no admissible evidence that SJ made funds transfers to WWW at any time. Although SJ made two funds transfers to third party The Raizada Group, they were made in 2011 and 2012. The purpose of the transfers was not to provide additional capital to WWW.

For purposes of legal analysis, it is important to identify when value is to be measured. Value is to be measured at the time of the transactions at issue and not with reference to past events. See *In re James River Coal Co*., 360 B.R. 139, 166 (Bankr. E.D. Va. 2007) citing *O'Donnell v. Royal Bus. Group, Inc*. 180 B.R. 1, 11 (Bankr D. Me 1995)("[D]efendants' claim that Royal 'gave value' when it invested in Oxford years before the LBO is specious. To accept the argument would be to license any liquidation of investment at any time, creditors be damned.") SJ makes the very same argument here that the court in *O'Donnell* said was "specious." It argues that an investment made in 2011 and/or 2012 was reasonably equivalent value to the transfer of funds from WWW ending in 2014. Since value is to be measured at the time of the transactions at issue, and not with reference to past events, SJ's argument fails.

SJ's argument is actually more attenuated than the argument deemed "specious" in *O'Donnell* because in this matter the funds that SJ claims that it transferred to WWW were not transferred to WWW at all, but rather were paid to, or found their way to third party, The Raizada Group. (See R8, Checks 1002 and 1007). SJ's attenuated argument does not establish that it gave reasonably equivalent value to WWW at any time, let alone at the time of the transactions at issue.

> The SJ motion cites solely to *Higgins v. Ferrari*, 474 S.W. 3d 630, 640 (Mo. App. W.D. 2015) to support its argument. That case analyzes a situation where there are several transfers during the same relative time frame (not involving capital contributions) which creates a quite different

fact pattern. As stated therein, however, constructive fraud is concerned with the underlying economics of the transaction to determine whether a transaction effectively undermined the position of creditors. "If the debtor's net worth is maintained, creditors cannot challenge a transfer as constructively fraudulent." 8A C.J.S. Bankruptcy § 692; see also See 37 Am.Jur.2d Fraudulent Conveyances and Transfers § 7 (database updated August 2015); *In re Gerdes*, 246 B.R. 311, 313 (Bankr. S.D.Ohio 2000) ("If the debtor's net worth is maintained, its creditors cannot complain of the transfer"); *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992) ("[T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred"); *In re Johnson Bros. Truckers Inc.*, 9 Fed.Appx. 156, 165 (4th Cir. 2001) (same); *In re Congrove*, 222 Fed. Appx. 450, 454 (6th Cir. 2007) (same).

Even if SJ's "net worth test" is used to analyze whether WWW received reasonably equivalent value, SJ's argument fails. There is no evidence that WWW received funds from SJ at any time. The evidence shows that funds went to The Raizada Group and not WWW. Moreover, it is

readily apparent that because nothing went to WWW, WWW had a net asset decrease in the amount of $276,400.00 (and net worth was not maintained) as a result of the transfers from WWW to SJ. In light of these facts, the value received by SJ from WWW was at least $276,400.00. The value received by WWW from SJ was $0.00 during the entire time period from 2011-2015.

### 3. The Transfers from WWW to SJ are Voidable By Blevins as Fraudulent Tranfers

R.S. Mo. 428.024(1) provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or obligation incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor … (2) In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of

> the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. For a court to find that the transfer was fraudulent, several badges of fraud must be shown. *Higgins v. Ferrari*, 474 SW 3d 630, 636 (Mo. Ct. App. 2015). However, even where a transfer is found to be fraudulent as to a creditor under Section 428.024.1, the transfer is not voidable "against a person who took in good faith and for a reasonably equivalent value [. . .]" Section 428.044.1.

Here several badges of fraud exist. A transfer from an LLC to one of its Members is a transfer to an insider. *In re Pearson*, No. 1:10-bk-00946MDF, 2010 WL 3956762, at *3 (Bankr. M.D. Pa. 2010). At the time of the transfers WWW had knowledge that Blevins' had made a claim against WWW for conduct occurring as early as December, 2013. Further, because SJ was being investigated by the CFPB for illegal conduct that started as early as 2011, it was apparent that the entire SJ organization and its affiliates were under the threat of legal proceedings. [Doc. 3, ¶ 31]. The transfers out of WWW left WWW without assets to satisfy the Blevins' claim that arose as early as 2013. [See Statement of Uncontroverted Fact No. 3].

Given these obvious badges of constructive fraud, SJ's only escape is if can show that it was a person who took the funds in good faith and for a reasonably equivalent value. SJ cannot show either. It cannot show good faith - after all a Receiver had to be appointed for SJ due to its participation in an illegal consortium. And further WWW did not receive any value for its transfers to SJ. Even after the Receiver's appointment, the Receiver remained willfully ignorant of the reasons it was receiving or had received substantial sums of money from WWW.

There being several badges of constructive fraud, and the fact that there was no value given by SJ that was received by WWW, the constructively fraudulent transfers are established and the transfers are therefore voidable by Blevins per R.S. Mo. 428.039(1)(1) and the court may allow Blevins to execute on SJ's assets per R.S. Mo. 428.039(2).

### 4. Blevins' Claims as Set Forth in the Previous Paragraph are not Limited by R.S. MO. § 428.029

SJ argues some of her alleged claims would only allow her to recover for the transfers that occurred after January 1, 2014. SJ failed to plead the "present creditor" defense as an affirmative defense in its pleadings and it has therefore waived the right to assert it now.

Furthermore, it does not apply to the UFTA claim made in the previous paragraph wherein it does not matter whether she was a "present creditor" or not. In the event that, the R.S. Mo. § 428.029 are important for her to recover, her claim first arose in December, 2013.

[See Statement of Uncontroverted Fact No. 3 and EEOC Charge of Discrimination (Exhibit R2), KB-E&J-000022-23.]

## C. CONCLUSION

In Blevins's Motion for Summary Judgment against SJ/Receiver, she sought Summary Judgment against the Receiver on three separate garnishment theories. With her response to this motion, Blevins has shown that the undisputed facts also entitle her to Judgment on her separate UFTA claims. There is no genuine issue of material fact that would preclude the entry of Summary Judgment in her favor on any claim whether it be a garnishment theory or a UFTA claim. The Statute of Limitations which SJ/Receiver relies on heavily in its motion is subject to equitable tolling while the stay was in effect and even if it did not toll the statute of limitations Blevins acted promptly within one year of discovering facts supporting a UFTA claim against a viable Defendant.

Provided that judgment is entered in Blevins favor, she also seeks leave to address her claim to pre-judgment interest and other supplemental remedies as part of any Judgment.

DATED this 21st day of February, 2020.

Respectfully submitted,

/s/ Kenneth N. Caldwell
KENNETH N. CALDWELL, ESQ.
MO Bar # 65443; NV Bar #3692
CALDWELL LAW FIRM, P.C.
1201 NW Briarcliff Pkwy, 2nd Floor
Kansas City, MO 64116
Phone: (816) 535-1001

Fax: (702) 548-9796

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this document with the Clerk of the Court on February 21, 2020 using the CM/ECF system.

/s/ Kenneth N. Caldwell
Kenneth N. Caldwell