**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-00789-SRB |
| | ) | |
| RICHARD F. MOSELEY, SR., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**KENDAL BLEVINS' REPLY**
**SUGGESTIONS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

## TABLE OF AUTHORITIES

**CASES**


*American Communications v. Commerce North Bank,* 691 S.W.2d 44, 48 (Tex.App. 1985) ........... 11

*Baden Bank of St. Louis v. Trapp*, 180 S.W. 2d 755, 759 (Mo. App. 1944) ..................................... 18

*Baisch & Skinner, Inc. v. Bair*, 507 S.W.3d 627, 629 (Mo. App. E.D. 2016) .................................. 17

*Crumpton v. Vick's Mobile Homes, LLC* ......................................................................................... 7

*Dolan v. Powers*, 260 S.W.3d 376, 385 (Mo. App. 2008) .............................................................. 18

*El Deeb v. Univ. of Minnesota*, 60 F.3d 423, 428-29 (8th Cir. 1995) .................................................. 8

*Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1296 (E.D. Mo. 1997) .................................. 23

*Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1297-98 (E.D. Mo. 1997) ............................. 24

*Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1300 (E.D. Mo. 1997) .................................. 23

*Gonsalves v. Li,* 232 Cal.App.4th at pp. 1416–1417 (Cal. App. 2015) ............................................ 11

*Hilke v. Bank of Washington*, 251 S.W. 2d 963, 966 (Mo. App. E.D. 1952). .................................. 17

*Hobbs v. Dir. of Revenue*, 109 S.W.3d 220, 222 (Mo. App. 2003) .................................................. 18

*J&J Sports Prods., Inc*. v. Saenz, note 32 (S.D. Tex. 2016) ............................................................ 10

*Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir.1949) ..................................................................... 8

*Pinkstaff v. Hill*, 827 S.W.2d 747, 750 (Mo. App. 1992) ................................................................ 18

*Vaughn v. Spitz*, 682 S.W. 2nd 847, 848 (Mo. App. 1984) ............................................................... 17

*Winn Dixie Stores, Inc. v. Gerringer* 563 So.2d 814, 817 (Fla. Dist. Ct. App. 1990) ....................... 11


**STATUTES**

KS Code § 17-7689(a)(6) .... 7

KS Code § 17-7689(b) .... 7

R.S. Mo. § 428.005 .... 16

R.S. Mo. 428.019(3) .... 23

**RULES**

Fed. R. Civ. P. 56(e) .... 8

Rule 90.02 .... 17, 18

Rule 90.02(c) .... 17

**TREATISES**

10A CHARLES A. WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed.1983) .... 8

COMES NOW, Kendal Blevins ("Blevins" or "Movant"), the Movant herein, by and through her counsel, Kenneth N. Caldwell, of Caldwell Law Firm, P.C. and submits her reply suggestions in support of her Motion for Summary Judgment.

## A. BLEVINS RESPONSE TO RECEIVER'S STATEMENT OF ADDITIONAL FACTS

1. On or about April 25, 2014, Kendal Blevins ("Blevins") entered into a Contract for Legal Services with the law firm of Ensz & Jester, P.C. "to prosecute [Blevins'] claim for compensation and/or damages against Worldwide Wireless, LLC and all other persons or entities considered liable as a result of an occurrence . . . ." *See* Contract for Legal Services (Exhibit R1), KB-E&J-00001194.

Uncontroverted.

*2.* The Contract for Legal Services described the "occurrence" as "inappropriate conduct directed toward Kendal Blevins by Scott Fodor and Worldwide Wireless employees as part of Blevins' employment with Worldwide Wireless." *Id.*

Uncontroverted.

3. On or about May 5, 2014, Blevins filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging harassment by Scott Fodor, who she stated was a regional manager for Worldwide Wireless, LLC ("WWW") and her supervisor. *See* EEOC Charge of Discrimination (Exhibit R2), KB-E&J-000022-23.

Uncontroverted, the charge of discrimination related to conduct that began to occur in December, 2013 and continued to occur until she was terminated in April, 2014. *See* EEOC Charge of Discrimination (Exhibit R2), KB-E&J-000022-23.

4. On September 9, 2014, the Court entered its Temporary Restraining Order with Asset Freeze (Doc. 8) preliminarily appointing Thomas McNamara as Receiver in this case.

Uncontroverted, however, it should be noted that the Complaint filed on 9/8/2014 against SJ partners and others alleged that the illegal conduct engaged in by SJ, began in 2011 or before. [Doc. 3, ¶ 31].

5. On October 3, 2014, the Court entered its Stipulated Preliminary Injunction with Asset Freeze, Appointment of Receiver, Expedited Discovery and Other Equitable Relief (the "Injunction") (Doc. 40), which confirmed McNamara's appointment as Receiver.

Uncontroverted. It should be noted that the Order also **stayed any action against SJ** or the other receivership entities. [Doc. 40, XXIV]. The Stay had to be lifted to allow Blevins to move forward with Blevins' garnishment and UFTA claims.

6. SJ Partners, LLC ("SJ") is a defendant covered by the Injunction. *See* Injunction (Doc. 40, page 4).

Uncontroverted.

7. Beginning on or about December 29, 2011, SJ had purchased and held a minority ownership interest in Worldwide Wireless, LLC. *See* relevant pages of 2011 Partnership Tax Return filed by SJ (Exhibit R7), Federal Statements, Statement 3, REC 195, REC 0203; Missouri Bank account statements (Exhibit R8), REC 0001, REC 0023 - 25 *and* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory Nos. 1 and 2, pgs. 4-5.

Uncontroverted.

8. The following funds were transferred between SJ and WWW between SJ's initial investment on December 29, 2011 and the final transfer from WWW to SJ on October 27, 2014:

| Date | Event | Transfer from SJ to WWW | Transfer from WWW to SJ |
|---|---|---|---|
| 12/29/2011 | Check from SJ to WWW | $440,000.00 | |
| 1/13/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 2/16/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 3/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 4/17/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 5/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 6/19/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 6/28/2012 | Check to Raizada Group, LP to increase investment to 14.55% | $200,000.00 | |
| 7/12/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 8/14/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 9/14/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 10/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 11/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 12/17/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 1/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 2/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 3/14/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 4/12/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 5/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 6/24/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 7/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 8/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 9/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 10/17/2013 | Deposit from WWW to SJ | | $5,820.00 |

| | | | |
|---|---|---|---|
| 11/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 12/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 1/22/2014 | Deposit from WWW to SJ | | $5,820.00 |
| 4/11/2014 | Deposit from WWW to SJ | | $5,820.00 |

*See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* Missouri Bank account statements and email (Exhibit R8), REC 0001 – 0081, 0659 – 0660.

Controverted. The purported factual statement(s) are not supported by any admissible evidence. The statements that the Receiver attempts to include in his convoluted fact statement are:

a. That there was an initial funds transfer from SJ to WWW on December 29, 2011;

b. That there was a final funds transfer from SJ to WWW on June 28, 2012;

c. That the funds transfers on both dates represents an investment in WWW.

The purported facts are not supported by the evidence. The December 29, 2011 table entry in the amount of $440,000.00 indicates that funds were transferred to WWW, however, the table entry does not indicate that the check made payable to WWW (Check No. 1002) was actually endorsed over to The Raizada Group and was not deposited into WWW's bank account. [R8, Doc. 281-1, p.33 of 152, Check No. 102 and Endorsement on back of check,].

The June 28, 2012 table entry in the amount of $200,000.00 indicates the check was made payable to The Raizada Group (Check No. 1007), however, the table entry is shown in the column for transfers from SJ to WWW which is not correct. SJ Check No. 2007 was actually a check in the amount of $200,000.00 made payable directly to The Raizada Group and not to WWW. [R8, Doc. 281-1, p.34 of 152].

Both check Nos. 1002 and 1007 (Exhibit R8) show that no funds were actually transferred to WWW but rather the recipient of all these funds was in fact The Raizada Group.

The end result is that WWW did not receive any funds from SJ.

9. SJ invested a total of $640,000 in WWW. *See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* relevant pages of Missouri Bank account statements (Exhibit R8), REC 0001, REC 0023 – 25, REC 0034 – 36.

Controverted in part. It is possible that SJ may have purchased a Membership Interest in WWW from The Raizada Group for $640,000, however, Exhibit R8 (Check Nos. 1002 and 1007) show that no funds were transferred directly to WWW by SJ. As a result WWW's cash position was <u>not increased</u> by the transfers, only The Raizada Group's cash position was impacted. On the other side of the coin, WWW's net cash position <u>was decreased</u> by distributions to SJ.

10. 10. SJ provided a payment of $440,000 to Worldwide Wireless, LLC on or about December 29, 2011. *See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* relevant pages of Missouri Bank account statements (Exhibit R8), REC 0001. Pursuant a Unit Purchase Agreement between Worldwide Wireless, LLC, Raizada Group, LP, and SJ Partners, LLC and dated July 1, 2012, it subsequently acquired an additional 4.55% in WWW. *See* Unit Purchase Agreement (Exhibit R16).

Controverted. Both check Nos. 1002 and 1007 (Exhibit R8) show that no funds were actually transferred to WWW but rather the recipient of all these funds was in fact The Raizada Group. The end result is that WWW did not receive any funds from SJ.

11. In exchange for its capital contributions, SJ received a total membership interest of 14.55% in WWW as of 2014. *See* Receiver/Garnishee's Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 2, pg. 5 *and* 2014 Schedule K-1 issued by WWW to SJ (Exhibit R10), REC_70463-70469.

Controverted in part. There is no admissible evidence of capital or cash contributions to WWW whatsoever but rather the evidence shows transfers to third party, The Raizada Group. The Receiver's Exhibit R8, Check Nos. 1002 and 1007, show that there were no funds paid to, and no capital contributions, to WWW. [ Exhibit R8, Check Nos. 1002 and 1007].

12. SJ only received a total of $274,260,00 in funds transferred from WWW as return on its investment. *See* Receiver/Garnishee's Amended Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-5 *and* Missouri Bank account statements and email (Exhibit R8), REC 0001 – 2, 0023 – 81, 0659 – 0660. Two of those distributions or transfers of funds from WWW were received shortly after the Receiver's appointment: (1) $5,820 on or about September 24, 2014, and (2) $116,400 on or about October 27, 2014. *See* Missouri Bank email (Exhibit R8), REC 0659 – 0660.

Controverted. There are two (2) parts to the purported fact statement. **First, the purported fact statement that SJ only received $274,260.00 from WWW.** In response to a Request for Admission No. 6 [Doc. 281-1, p.119 of 152] the Receiver provided the following response.

> 16. Admit that the K-1 to SJ Partners, LLC. from WWW for 2015 showed a distribution to SJ Partners, LLC. in the amount of $520,475.
>
> **RESPONSE:** The Receiver did not prepare the referenced 2015 Schedule K-1 from WWW to SJ Partners, LLC. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny the basis or reasoning for, information underlying, or the truth or accuracy

> of any amounts or entries included on the 2015 Schedule K-1. The Receiver admits the 2015 Schedule K-1 issued by WWW for SJ Partners, LLC, the document identified as REC_70470 – 70475 produced concurrently with his responses to these Requests, speaks for itself.

[Doc. 281-1, p.119 of 152]

The Receiver did not conclusively state that SJ did not receive the reported distribution in the amount of $520,475 during 2015. Given that the Receiver has no personal knowledge whether the additional amount of $520,475 was not paid to SJ or not paid to another bank account of SJ, or not paid to another party on behalf of SJ, there is a disputed issue of fact with respect to that additional amount reported on SJ's K-1.

When the Receiver was appointed as Receiver for SJ on October 3, 2014, KS Code § 17-7689(a)(6) would have triggered SJ's cessation of Membership in WWW one hundred twenty (120) days after the Receiver was appointed. See KS Code § 17-7689(b). This would have occurred on approximately January 9, 2015, 120 days after the Receiver's appointment per Kansas statute. This cessation of SJ's membership interest would have triggered a transfer of whatever interest SJ had in WWW to the other then existing LLC members including The Raizada Group. See generally *Crumpton v. Vick's Mobile Homes, LLC*, 335 Ga. App. 155, 779 S.E.2d 136 (Ga. App. 2015). The fact that SJ did not have a legal interest in WWW subsequent to January, 2015 may explain why SJ did not receive the $520,475 reported on the K-1 provided to SJ. Any cash distribution from WWW (as reflected in the K-1) after SJ's Membership Interest in WWW ceased would likely have gone to The Raizada Group.

**The second part of the purported fact statement is that $274,260 was received "as a return on investment."** It is inconceivable for the Receiver to take the position that he does not know what the WWW item in the amount of $558,808.00 was on SJ's balance sheet that he reported to the court in 2014 (which appears to be a short term investment in WWW) and yet he

somehow has admissible evidence that $274,260 received from WWW between 2011 and 2014 was a return on that investment. The inconsistency is made apparent by the Receiver's responses to Blevins' Request for Admission No. 7.

> 7. Admit that the WWW asset appears on the **Exhibit A** Balance Sheet as a "current asset" valued at $558,808.00.
>
> **RESPONSE:** The Receiver objects to the extent "the WWW asset" is vague, ambiguous, and subject to multiple interpretations. The Receiver admits Exhibit A speaks for itself. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny any basis for, or the actual valuation of or entry of the amount entered for, the "WWW asset" as of March 31, 2014.

[The Receiver's Responses to Blevins' First Request for Admissions, No. 7, Doc. 281-1, p.116 of 152.] The Receiver could not take a definitive position on what the investment represented and in that same stead, he cannot definitively state with any personal knowledge state that the $274,260 was a return on that investment. The Receiver's statement violates Fed. R. Civ. P. 56(e) and is therefore not admissible.

Fed. R. Civ. P. 56(e) requires that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters staged therein." Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge. *El Deeb v. Univ. of Minnesota*, 60 F.3d 423, 428-29 (8th Cir. 1995). Affidavits filed by a party in support of or in opposition to a motion for summary judgment must present evidence. *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir.1949); 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2738 (2d ed.1983).

The Receiver has simply failed to comply with Fed. R. Civ. P. 56(e) in support of his factual statements including this one where he claims the amount stated constitutes a return on an unverified investment by SJ. He has not even attempted to support the factual allegation with an affidavit and thus the purported factual statement is inadmissible.

13. According to its 2014 federal tax return, WWW provided total distributions in the amount of XXXXX to its members in 2014. *See* Relevant pages of WWW's 2014 federal tax return (Exhibit R18), WW 0010. Consistent with its ownership interest in the company, SJ received $145,500 of those distributions. *See* 2014 Schedule K-1 issued by WWW to SJ (Exhibit R10), REC_70464.

Controverted in part. Blevins admits that it shows $145,500.00 was distributed to SJ but whether it was consistent with its ownership in the company is conjecture.

14. On October 2, 2014, the Receiver filed his Preliminary Report of Temporary Receiver (Doc. 37), with its Preliminary Financial Report attached as Exhibit A. *See* Preliminary Report of Temporary Receiver (Docs. 37 and 37-1). The Preliminary Financial Report noted the SJ accounting records available for review "start 8/31/11 with the last entry made 3/31/14." *See* Preliminary Financial Report (Doc. 37-1), pg. 7. SJ's Balance Sheet and Profit & Loss Statement contained in the report were generated with SJ's QuickBooks data current as of March 31, 2014 entered by person(s) other than Receiver. *See* Preliminary Financial Report (Doc. 37-1), pgs. 31- 32 *and* Receiver's Answers and Objections to Garnishor's First Requests for Admission (Exhibit R11), pgs. 2-4, Responses Nos. 2-9.

Uncontroverted that the records were incomplete and unsubstantiated.

15. The Receiver has not received any other transfers, assets, or other items of any value from WWW since the final transfer from WWW on or about October 27, 2014. *See*

Receiver/Garnishee's Amended Answers to Judgment Creditor's Interrogatories (Exhibit R9), Answer to Interrogatory No. 1, pgs. 4-6, Missouri Bank account statements (Exhibit R8), REC 0001 – 2, 0023 - 81, 0659 - 0660, *and* Receiver's Answers and Objections to Garnishor's First Requests for Admission (Exhibit R11), Responses Nos. 19-21, 23, and 31.

Controverted. The Receiver's Response to Blevins' First Request for Admissions, Nos. 6 and 7 was as follows:

> 6. Admit that the K-1 to SJ Partners, LLC. from WWW for 2015 showed a distribution to SJ Partners, LLC. in the amount of $520,475.
>
> **RESPONSE:** The Receiver did not prepare the referenced 2015 Schedule K-1 from WWW to SJ Partners, LLC. The Receiver has made reasonable inquiry, but the information he knows or can readily obtain is insufficient to enable him to admit or deny the basis or reasoning for, information underlying, or the truth or accuracy of any amounts or entries included on the 2015 Schedule K-1. The Receiver admits the 2015 Schedule K-1 issued by WWW for SJ Partners, LLC, the document identified as REC_70470 – 70475 produced concurrently with his responses to these Requests, speaks for itself.

Based on the Receiver's responses above, he admits that WWW gave SJ a K-1 for a share of distributions in the amount of $520,475 for tax year 2015. The Receiver, in admitting No. 6 above, stated that he was unable to determine the "truth or accuracy" of the information contained in the K-1. This means that the Receiver doesn't know one way or the other whether SJ received the $520,475 distribution from WWW in 2015.

Further, none of the sources cited in support of his purported fact statement are admissible. The Receiver's Answers and Objections to Garnishor's First Requests for Admission (Exhibit R11), Responses Nos. 19-21, 23, and 31 are the Receiver's own Responses to Blevins' Request for Admissions and are hearsay and not admissible. *J&J Sports Prods., Inc*. v. Saenz, note 32 (S.D. Tex. 2016). Alternatively, the Responses include at least partial denials, and denials are inadmissible at

trial (and on summary judgment.) *Winn Dixie Stores, Inc. v. Gerringer* 563 So.2d 814, 817 (Fla. Dist. Ct. App. 1990); *American Communications v. Commerce North Bank,* 691 S.W.2d 44, 48 (Tex. App. 1985); *Gonsalves v. Li,* 232 Cal.App.4th at pp. 1416–1417 (Cal. App. 2015).

16. On January 5, 2015, an EEOC investigator wrote a letter to Blevins informing her that the EEOC's "review of the evidence in [her] file indicates that it is insufficient to conclude that an EEOC statute was violated." *See* Relevant pages from Blevins' EEOC file (Exhibit R17), KB-E&J-000031, 000057. The letter further advised her that if the EEOC did not hear from her or she did not provide "any additional information that would change its determination . . . , then [her] charge will be closed" and she would be issued a right to sue notice. *Id.*

Uncontroverted.

17. On January 19, 2015, the EEOC issued a Notice of Right to Sue to Blevins. *See* Relevant pages from Blevins' EEOC file (Exhibit R17), KB-E&J-000031-34.

Uncontroverted.

18. Blevins filed her Petition in Johnson County District Court on February 12, 2015 alleging employment discrimination against Worldwide Wireless, LLC and Scott Fodor (the "Johnson County Case"). *See* Petition (Exhibit R12) *and* Docket Sheet, Johnson County Case (Exhibit R13). Her Petition was never amended. *Id.*

Uncontroverted.

19. SJ Partners, LLC was not a defendant in the Johnson County Case and was not mentioned in Blevins' Petition. *See* Docket Sheet, Johnson County Case (Exhibit R13), Petition (Exhibit R12), *and* Default Judgment Entry (Doc. 223-1).

Uncontroverted. Blevins had no knowledge of what had happened with WWW and no suspicion that WWW had transferred assets to SJ.

20. Blevins served WWW a copy of the Summons and Petition in the Johnson County Case through the Kansas Secretary of State. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Default Judgment Entry (Doc. 223-1).

In whatever manner it was served, the Kansas Court determined it was proper.

21. On August 6, 2015, Blevins' employment counsel, James Ensz of Ensz & Jester, sent her an email advising her that they would have difficulty in collecting any judgment against WWW and Fodor. *See* 8-6-15 email from Ensz to Blevins (Exhibit R3), KB-E&J-0000921. Blevins' counsel believed WWW was "out of business," and had "no reason to believe [Fodor had] assets of any significance justifying the expense necessary" to serve him, prosecute the case, and collect on any judgment against him. *Id.*

Uncontroverted.

22. Ensz & Jester recommended to Blevins that she obtain a default judgment against WWW and notify an allegedly affiliated or related entity named Spectrum Business Ventures, **"which seems to have more than a passing interest in protecting Worldwide's assets."** ***See*** **Exhibit** R3.

Controverted in part. Ernz & Jester actually obtained the default judgment for her and took whatever action they deemed appropriate at the time.

23. Blevins' counsel further advised her "[t]here very well could have been a fraudulent transfer of assets from Worldwide to Spectrum and/or its wealthy owner Amit Raizada [sic] that the latter will want to protect from a potential fraudulent conveyance action following a potential judgment against Worldwide in this case." *See* Exhibit R3.

Uncontroverted that the quote appeared in a letter to her, however, suggesting that Amit Raizada "will want to protect himself from a fraudulent conveyance" claim had little if any meaning to Blevins and nothing whatsoever was mentioned about SJ being a possible recipient of funds that should not have been transferred to it. Blevins had no possible way to know that money had been transferred from WWW to SJ based on her attorney's vague correspondence.

Even WWW's Limited Liability Company Annual Report filed with the Kansas Secretary of State by Amit Raizada on February 23, 2015 under penalty of perjury. [Doc. #293 -Ex. KB-1] stated that he, individually, was the only Member of WWW who had an interest greater than 5%. There is no way that Blevins or her attorneys could have suspected that the document on file with the Kansas Secretary of State was incorrect or intentionally deceptive.

24. On or about April 1, 2016, Blevins' employment counsel sent her a letter and memorandum summarizing some efforts undertaken by the firm to locate Amit Raizada. *See* 4-1- 16 letter and memorandum from Ensz to Blevins (Exhibit R4), KB-E&J-00009-11.

Uncontroverted.

25. On or about the same day, Blevins' employment counsel sent a letter to WWW, care of Angela M. Correll, Controller for Spectrum Business Ventures, Inc. *See* 4-1-16 letter from Ensz to Correll (Exhibit R5), KB-E&J-000014. The letter referenced Blevins' lawsuit against WWW and enclosed copies of the Petition, Blevins' Motion for Default Judgment, and Notice of Hearing. *Id.*

Uncontroverted.

26. On April 27, 2016, Blevins obtained an uncontested default judgment against Worldwide Wireless, LLC and Scott Fodor for alleged employment discrimination (the "Default Judgment"). *See* Default Judgment Entry (Doc. 223-1). The Default Judgment included actual

damages in the amount of $150,000, punitive damages in the amount of $150,000 and attorneys' fees in the amount of $120,000. (Doc. 223-1). No judgment was sought or entered against SJ Partners, LLC in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Default Judgment (Doc. 223-1).

Uncontroverted. Blevins was unaware that SJ was a Member of WWW, Blevins' attorney was unaware that SJ may have once been a Member of WWW, and the Receiver did not undertake any investigation to try and determine why SJ was receiving significant payments from WWW or whether it was entitled to keep them.

27. On or about May 3, 2016, Ensz & Jester sent a letter to Blevins enclosing a copy of the Default Judgment. *See* 5-3-16 letter from Ensz to Blevins (Exhibit R6), KB-E&J-00001 – 5. The letter informed her that Ensz & Jester's "ongoing, active participation in this matter" was ending with the delivery of the Default Judgment. *Id.*

Uncontroverted.

28. Despite obtaining the Default Judgment, Blevins took no action to utilize any post-judgment discovery methods or processes through Johnson County District Court, or any other court, until she filed a Motion for Order for Hearing in Aid of Execution on May 14, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 3 (Exhibit R14).

Uncontroverted, but the Receiver made it clear that Blevins was precluded from taking action against SJ because of the stay entered October 3, 2014.

29. Despite obtaining the Default Judgment, Blevins took no action through, or otherwise attempted to utilize, any court process to attempt to execute, levy, or otherwise collect

on the Default Judgment until she filed a Motion for Order for Hearing in Aid of Execution on May 14, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13) *and* Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 4 (Exhibit R14).

Uncontroverted but the October 3, 2014 Receivership stay prevented her from taking any action against SJ.

30. Blevins made no mention of any potentially or allegedly fraudulent transfers related to the Default Judgment in any pleading or other document filed with any court until she filed her Redacted Motion for Garnishment and Suggestions in Support Thereof on December 31, 2018 in the Johnson County Case. *See* Docket Sheet, Johnson County Case (Exhibit R13); Kendal Blevins' Responses to Receiver's First Requests for Admission to Garnishor, Response No. 5 (Exhibit R14); *and* Redacted Motion for Garnishment and Suggestions in Support Thereof (Exhibit R15).

Uncontroverted, however, some unknown person hired an attorney for WWW and made it very difficult for Blevins' attorneys to obtain any documentation from WWW. Eventually, Blevins had to agree to a protective order to even look at any documents. When documents were obtained, it was first discovered by her counsel in October, 2018 that a company by the name of SJ Partners, LLC. had at one time been involved with WWW and that the relationship was worth exploring to determine the reasons for the transactions between them.

See Declaration of Edward Foster [Doc. #293, Exhibit KB-2].

31. Blevins filed her Motion for Clarification of Stay Order Included in the Stipulated Asset Freeze Between the Parties and/or to Lift the Stay for Purpose of Allowing Garnishment of

the Court Appointed Receiver Over the Assets of SJ Partners, LLC in this case on March 28, 2019. *See* Motion for Clarification of Stay Order (Doc. 223).

Controverted in part. When Blevins first contacted the Receiver for SJ about serving a Garnishment, the Receiver hired counsel to rebuff any attempt, claiming that any such attempt would violate a stay that protected the Receiver from such claims. Blevins drafted and file a motion to lift any applicable stay. The stay had been in place since October 3, 2014.

32. Blevins filed her Exceptions and Claims in this case, which was the first pleading stating her claim for relief or cause of action under the Missouri Uniform Fraudulent Transfer Act ("MUFTA"), R.S. Mo. § 428.005, *et seq.*, in this case on November 14, 2019. *See* Garnishor's Exceptions and Claims (Doc. 259).

Uncontroverted, however, Counsel for Blevins contacted the Receiver by email on March 11, 2019 about the garnishment proceeding. The Receiver provided the following curt and ominous response on March 26, 2019.

To: Kenneth N. Caldwell

Read the order and proceed at your own peril.

Thomas W. McNamara
McNamara Smith LLP
655 W Broadway, Suite 1600
San Diego, CA 92101
619-269-0499
tmcnamara@mcnamarallp.com

---

## B. BLEVINS' REPLY ARGUMENTS

Blevins set forth three (3) arguments in her Motion for Summary Judgment which would entitle her to the summary judgment she requests. As stated in Blevins' Motion, the first argument is based on a direct application of Missouri's garnishment statutes. The second argument relates to Blevin's right to assert WWW's hypothetical rights against SJ. The third argument relates to the assertion of Blevins' own rights against SJ as allowed under the UFTA. Blevins' legal arguments as to why SJ's position is not sustainable are set forth below.

**1. <u>THE GARNISHMENT CLAIM</u>**

Blevins discusses each of the SJ's arguments below.

SJ first mistakenly argues that "Blevins cannot garnish any entity other than the sole judgment debtor …" [1] SJ misconstrues the requirements of a garnish claim. According to Missouri rules of civil procedure Rule 90.02, the guidelines for filing an application for writ of garnishment are as follows: (a) That the garnishor knows or has good reason to believe that the garnishee is indebted to debtor, (b) that the garnishee is obligated to make periodic payments to debtor, or (c) that the garnishee has control or custody of property belonging to debtor. Rule 90.02(c). SJ cites to the case of *Baisch & Skinner, Inc. v. Bair*, 507 S.W.3d 627, 629 (Mo. App. E.D. 2016) to support its argument that Blevins cannot garnish SJ, however, *Baisch* specifically states to the contrary. *Baisch* specifically provides that "[c]reditors may reach funds in the bank account of another if the funds actually belong to the debtor." *Vaughn v. Spitz*, 682 S.W. 2nd 847, 848 (Mo. App. 1984) citing *Hilke v. Bank of Washington*, 251 S.W. 2d 963, 966 (Mo. App. E.D. 1952). That is exactly the situation here, i.e. WWW's funds are in the bank account of SJ and SJ has admitted that the source of $274,600.00 in

[1] The whole purpose of garnishment is to reach the judgment debtor's property possessed by a third party. *Vaughn v. Spitz*, 682 S.W. 2nd 847, 848 (Mo. App. 1984). If the WWW's property had been held by WWW there would be no need to resort to garnishment.

funds was WWW. In other words, SJ has admitted that it has control or custody of property that came from the judgment debtor, and the only question remaining is whether the funds belong to WWW or to SJ. Rule 90.02.

The fact that funds are deposited in a person's name is prima facie evidence that the funds belong to that person." *Pinkstaff v. Hill*, 827 S.W.2d 747, 750 (Mo. App. 1992) (citing *Baden Bank of St. Louis v. Trapp*, 180 S.W. 2d 755, 759 (Mo. App. 1944)). "`Prima facie evidence' is `[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'" *Dolan v. Powers*, 260 S.W.3d 376, 385 (Mo. App. 2008) (citing *Hobbs v. Dir. of Revenue*, 109 S.W.3d 220, 222 (Mo. App. 2003)). That means that initially the rebuttable presumption is in favor of SJ but that is not the end of the inquiry. Upon presentation of prima facie evidence, the party challenging it, in this case Blevins, has the burden of proof to demonstrate contrary facts. See *Dolan*, 260 S.W.3d at 385.

Blevins can demonstrate contrary facts here. First, the court can take judicial notice that SJ was one entity among many that were part of a criminal enterprise consisting of many companies controlled by the Moseley's that had been operating at least since 2011.[1] [See Doc. 3, ¶ 30 and 31]. SJ is not a company that enjoys any presumption of innocence or good faith, but rather a cloud of suspicion hangs over any transfers to or from SJ. From at least 2011 forward, SJ and its affiliates would have been seeking ways to move money out from under the companies that were under suspicion for illegal activities. SJ's receiver has admitted that $274,600.00 of funds received by SJ are traceable to WWW. His answer in his answers to interrogatories was as follows:

---

[1] WWW was not one of the companies named in this proceeding.

**ANSWER:** Based on a review of bank records obtained from Missouri Bank encompassing the period of approximately March 2011 to August 2014 (produced and labeled as REC 0001-0081), a subsequent email from a Missouri Bank representative regarding additional transactions that posted to the account while SJ's assets were frozen pursuant to the TRO (REC 0658-0659), and SJ's QuickBooks records, funds transfers between WWW and SJ are summarized below.

| Date | Event | Transfer from SJ to WWW | Transfer from WWW to SJ |
|---|---|---|---|
| 12/29/2011 | Check from SJ to WWW | $440,000.00 | |
| 1/13/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 2/16/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 3/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 4/17/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 5/15/2012 | Deposit from WWW to SJ | | $4,000.00 |
| 6/19/2012 | Deposit from WWW to SJ | | $4,000.00 |

| Date | Event | Transfer from SJ to WWW | Transfer from WWW to SJ |
|---|---|---|---|
| 6/28/2012 | Check to Raizada Group, LP to increase investment to 14.55% | $200,000.00 | |
| 7/12/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 8/14/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 9/14/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 10/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 11/16/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 12/17/2012 | Deposit from WWW to SJ | | $5,820.00 |
| 1/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 2/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 3/14/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 4/12/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 5/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 6/24/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 7/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 8/15/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 9/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 10/17/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 11/21/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 12/18/2013 | Deposit from WWW to SJ | | $5,820.00 |
| 1/22/2014 | Deposit from WWW to SJ | | $5,820.00 |
| 4/11/2014 | Deposit from WWW to SJ | | $5,820.00 |
| 5/16/2014 | Deposit from WWW to SJ | | $2,910.00 |
| 6/24/2014 | Deposit from WWW to SJ | | $2,910.00 |
| 7/23/2014 | Deposit from WWW to SJ | | $2,910.00 |
| 8/19/2014 | Deposit from WWW to SJ | | $2,910.00 |
| 9/24/2014 | Deposit from WWW to SJ | | $5,820.00 |
| 10/27/2014 | Deposit from WWW to SJ | | $116,400.00 |
| | **TRANSFER TOTALS:** | **$640,000.00** | **$274,260.00** |

Other than the transactions listed above, the Receiver is currently unaware of any other traceable and/or identifiable WWW Assets transferred to, or currently in possession of, SJ.

See Doc. 282, Ex. F, Receiver's Answers to Garnishor's Interrogatories.

In the table above, SJ admits by virtue of the listed transactions and the transaction total in column 4 that it received funds from WWW totaling $274,260.00. By virtue of SJ's admission, Rule 90.10(a) comes into play which states that "[w]hen garnishee admits in its answers to interrogatories that any property subject to garnishment is in the garnishee's possession, the garnishee, without further order of the court, shall pay or deliver such property into court or to the attorney for the party on whose behalf the order of garnishment was issued …" Rule 90.10(a).

SJ only conceded, however, that the funds came from WWW but not necessarily that they belonged to WWW. To controvert that position, Blevins, as the garnishor, filed exceptions to the garnishee's answers to interrogatories implicating Rule 90.10(b) with respect to the issues not admitted in the answers to interrogatories. Rule 90.10(b) provides that "[i]f the garnishor files exceptions to the garnishee's answers to interrogatories or if a third party has intervened as provided by Rule 90.09, the court or jury shall determine all controverted issues raised by garnishor's exceptions to the garnishee's answers to interrogatories, the garnishee's response thereto, and any claim asserted by a third party who has intervened. The court shall enter judgment in accordance with the findings of the court or jury …" Rule 90.10(b).

SJ claims that the funds from WWW were distributions in the form of return on investment in WWW. For its investment, SJ relies on two checks in its file, one for $440,000.00 that was made out to WWW but endorsed to The Raizada Group for deposit, and a second check for $200,000.00 made out directly to the Raizada Group. SJ boldly claims now that the money was an investment in or intended to be an investment in WWW. SJ has not provided any evidence of the actual purpose of the distributions, only conjecture. The Receiver confessed his lack of knowledge to the Department of Treasury, stating specifically that he did not have adequate information to correctly or accurately report

SJ's transactions and could not make reasonable judgments as to tax treatment for the transactions. He provided that information in a Disclosure Statement submitted with SJ's tax filings for 2015. See Ex. G, attached hereto. He made it clear that had "not verified the information carried forward from previously filed tax returns or other records, and therefore, cannot provide any assurances as to the validity of information obtained from records previously prepared by the Defendants or their representatives." The Receiver further stated with respect to the K-1 and 1099's it received that "The Receiver has been provided with a few Schedules K-1 and Forms 1099 for certain of the Defendants; however, the amounts reflected on any applicable Schedules and Forms have not been separately included in this tax return. The Receiver does not have adequate information to correctly or accurately report these transactions aside form any information that may be included in the summary reports provided and maintained by the Defendants attached hereto. … Because the Receiver and his professional are unable to make reasonable judgments as to the proper tax treatment of pre-receivership transactions and respective impact on 2015 equity balances, this return does not reflect individual equity account balances carrying forward into this tax return or an allocation of current "income" and "loss" items. … This return has been prepared upon the best information available at this time and has been prepared to best of the Receiver's ability under the circumstances. However, the Receiver can provide no assurance as to the completeness or accuracy of the information relied upon in the preparation of this tax return, other than that obtained from the Receiver's own records. If the Receiver receives additional and/or more accurate information, an amended return will be prepared, if appropriate." (See Ex. G.)

With the Receiver's self-proclaimed lack of personal knowledge, his testimony here by his attorneys' conjecture is not admissible in any case. The only fact that is established for certain is that $274,600.00 was received from WWW for some unknown purpose for which the Receiver could not

correctly account for or accurately report to the Department of Treasury. Further, if the purpose of the transfers were dividends or return of capital, the transactions gave preference to the members of the company over creditors, avoiding Blevins' and any other creditor's claim. At a minimum, a disputed issue of fact exists as to whether the funds received by SJ rightfully belonged to SJ.

**2. BLEVINS STEPS INTO THE SHOES OF WWW.**

SJ takes the position that Blevins has not asserted an "unjust enrichment" claim against SJ. Blevins, however, is not asserting her own "unjust enrichment" claim against SJ, but rather in a garnishment action she has the right to assert any claim that the judgment debtor would have had the right to make against the garnishee. Moreover, the exceptions Garnishor raised for trial only related to the matters not admitted by SJ in its answers to interrogatories. SJ clearly admitted in its answers to interrogatories all of factual elements necessary to establish the elements of unjust enrichment, i.e. that it received $274,600.00 (i.e. that SJ was enriched by the receipt of a benefit), that the funds came from WWW (i.e. SJ's enrichment was at the expense of WWW), and whether it was unjust for SJ to retain them would be an equitable matter for the court.[1] Rule 90.10(a) controls the admitted answers of the garnishment without further pleading, and Rule 90.10(b) requires that the controverted issues proceed to determination by the finder of fact. The fact that SJ had received $274,260.00 in funds from WWW was not controverted and is no longer at issue.

---

[1] Although SJ disputes that the transfers resulted in unjust enrichment to it, it bases its argument on its purported evidence that WWW was making distributions to it based on SJ's alleged ownership interest in WWW. These assertions are the very same assertions that it disclaimed any accurate knowledge of to the Department of Treasury. (See Ex. G.) SJ is judicially estopped from taking one position with the federal government (i.e. disclaiming any knowledge of the transactions) and reversing course here and claiming very specific knowledge of the purpose of the distributions.

Even if for some reason an equitable unjust enrichment claim has to be requested in Garnishor's exceptions, it is encompassed within the request for "whatever further relief the Court deems, just, necessary and proper in the premises" which is section G of the filing. (See Doc. 259, p.5).

**3. WWW's UNJUST ENRICHMENT ARGUMENT IS NOT BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.**

SJ argues that the Blevins/WWW unjust enrichment argument is barred by the five (5) year statute of limitations. Although Blevins agrees that the statute of limitations for unjust enrichment is five (5) years in Missouri, she does not agree that the date of the filing of her Motion for Summary Judgment is a significant date impacting her right to bring her garnishment claim. First or all, it should be noted that contrary to the arguments of SJ, the MoUFTA statute of limitations are not jurisdictional, and thus, are subject to waiver, estoppel, and equitable tolling. *Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1300 (E.D. Mo. 1997). When equitable tolling is considered during the period of the stay imposed by this court, and ultimately lifted for this proceeding, there is no statute of limitations issue. Even if there had been no stay, the date that Blevins filed her garnishment action on July 22, 2019 (Doc. No. 247) is the latest filing date that triggered all of her garnishment rights, and based thereon the claim was filed within any applicable five (5) year window.

**4. WWW DID NOT RECEIVE REASONABLY EQUIVALENT VALUE FOR ITS TRANSFERS**

SJ argues that WWW received reasonably equivalent value for the $276,400.00 that it received. SJ states the "reasonably equivalent value" is not defined in MoUFTA but fails to point out that "value" is defined in MoUFTA at R.S. Mo. 428.019(3). It provides that "[a] transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous. See *Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1296 (E.D. Mo. 1997). SJ simply has no plausible argument that it gave contemporaneous value or intended to give contemporaneous value to WWW in exchange for the $274,600.00.

There is not even any evidence that it ever increased WWW's net asset position or capital at any time. The $440,000.00 check in 2011 was deposited in The Raizada Group's account, not WWW's. The $200,000.00 check was written to the Raizada Group directly, not WWW. Furthermore, even if one of the checks had gone to WWW as capital, capital cannot be freely distributed to members of an LLC. without making provisions for creditors. Creditors come first, not members. The bottom line is that the funds transfers did not go to WWW, the transfers were not contemporaneous, the creditors had priority over the members, and the transfers involved SJ which was already under suspicion for criminal and/or fraudulent activities. SJ has no reasonable argument that WWW received reasonably equivalent value for the transfers.

**5. THE BADGES OF FRAUD**

SJ misinterprets the law when it comes to the badges of fraud. It claims that it is Blevins is not entitled to rely on any presumption of fraud. No where does SJ cite the case of *Fleming Companies, Inc. v. Rich*, 978 F.Supp. 1281, 1297-98 (E.D. Mo. 1997) which states that "although none of the badges standing alone will establish fraud the existence of several of them will raise a presumption of fraud." As pointed out in Blevins' Motion there are several badges of fraud present which raises the presumption of fraud that is not dispelled by any evidence of SJ.

SJ refuses to acknowledge that it was operating illegally and that a receivership was appointed because of its illegal activities.[1] It is not entitled to any presumption of innocence or of good faith. Money was moving freely between entities and including to entities such as the Raizada Group that did not get caught up in this litigation. There was no evidence that the entities involved were operating

[1] It is ironic that the Receiver was put in place because of SJ's involvement in criminally fraudulent activities and yet the Receiver is now taking the position that there are not any badges of fraud related to SJ's transactions.

at arm's length or even for their own best interest. Under this set of facts, it does not take but a few of the badges of fraud to tip the scales in favor of Blevins and place the burden on SJ to overcome the presumption of fraud.

SJ argues that it was not an "insider" as defined by the UFTA. At a minimum there is a question of fact whether SJ was an "insider" as a member stands in the same ownership position as does a shareholder to a corporation and the transfers took money out of the hands of WWW and put it in the hand of its owners bypassing WWW's creditors. At the same time funds were being transferred to WWW, a much larger proportionate interest was being transferred to The Raizada Group based on its majority and controlling interest in WWW. At a minimum, whether the transfers were to an "insider" is a question of fact.

SJ argues that the transfers were not concealed but even the fact that SJ had an ownership interest in WWW was concealed by Amit Raizada who filed WWW's annual report as a public report claiming that he personally was the only owner. WWW's annual report was the most likely place that anyone would look for information about ownership of WWW, and both the SJ ownership and the Raizada Group ownership interests were concealed. If ownership was concealed from the public, it is obvious that the transfers to its insiders, including SJ, were concealed from the public. The SJ Receiver who was put into place to protect all creditors did nothing to determine why SJ received funds from WWW, or whether it was accepting funds that should be going to WWW's creditors. In spite of SJ's continuing interest in WWW, SJ's receiver has no information or knowledge about WWW, which has, as recently as May, 2019 filed an annual report claiming that Amit Raizada is the only member with a greater than 5% interest. See ……………………………………………………………………...
https://www.kssos.org/filed_doc_viewer/view_entity.aspx?id=11022009637736012&submit=View+History+and+Documents

SJ also argues that WWW did not even know that Blevins had a claim against it when WWW started transferring funds to SJ. It doesn't matter whether WWW was aware of Blevins' specific claim or not where it was clear that WWW's owners were under threat from other potential creditors including the CFPB. The owners of WWW were under scrutiny from the CFPB because of their illegal activities since at least 2011. WWW was likely distributing funds to avoid as much scrutiny as possible and did so by moving most of the funds out of WWW and into The Raizada Group. The relatively small comparative portion that went to SJ was probably sacrificial in the sense that it kept inquiring eyes off of the Raizada Group while it was receiving most of the funds that were siphoned out from under the CFPB Receivership umbrella. If WWW intended to transfer assets to avoid potential creditors it does not matter that it was not aware of Blevins' specific claim.

In sum, SJ seeks to act under a presumption that SJ was a clean independent company not tied into the illegal payday loan business being operated as a criminal enterprise. The SJ Receiver seeks to disclaim any knowledge about the WWW/SJ transactions for the IRS when at the same time it seeks to submit into evidence in this case very specific knowledge about the purpose of the distributions. There are enough badges of fraud, and suspicion, with respect to the money flow from WWW to SJ that the presumption of fraud is triggered, that SJ cannot overcome.

**C. CONCLUSION.**

In conclusion, it is the Receiver's mandate to be a neutral party for the protection of all creditors, including Kendal Blevins. Instead, after informing Blevins's counsel that a stay applied to her claims, now claims that her claims expired because she didn't bring her garnishment action in time. He misstates the law in Missouri that allows for equitable tolling in a UFTA action and further misstates the law with respect to the presumption of fraud that arises when there are several badges of

fraud present. Finally, he attempts to claim detailed knowledge of WWW's transactions when he has previously disclaimed such knowledge in federal tax filings.

Ms. Blevins has established at a minimum that there are genuine issues of material fact for trial precluding summary judgment, and more likely sufficient evidence in her favor to grant her summary judgment on her garnishment and UFTA claims. She respectively requests that summary judgment be entered accordingly.

DATED this 14th day of March, 2020.

Respectfully submitted,

/s/ Kenneth N. Caldwell
KENNETH N. CALDWELL, ESQ.
MO Bar # 65443; NV Bar #3692 CALDWELL LAW FIRM, P.C.
1201 NW Briarcliff Pkwy, 2nd Floor
Kansas City, MO 64116
Phone: (816) 535-1001
Fax: (702) 548-9796

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this document with the Clerk of the Court on March 14, 2020 using the CM/ECF system.

/s/ Kenneth N. Caldwell
Kenneth N. Caldwell